UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| I.D. as parent of minor H.G.,<br><br>Plaintiff,<br>v.<br><br>FRANKLIN PIERCE SCHOOL DISTRICT,<br><br>Defendant. | CASE NO. 3:25-cv-05367-DGE<br><br>ORDER AFFIRMING DECISION BY HEARING OFFICER |

Plaintiff I.D., as parent of minor H.G., seeks judicial review of the Findings of Fact, Conclusions of Law, and Final Order ("Final Order") entered by an Administrative Law Judge ("ALJ") on January 31, 2025. (Dkt. No. 1 at 1.) The Final Order was issued pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*., 28 U.S.C. §§ 2201 and 2202, and the Washington Education for All Act, Washington Revised Code § 28A.13 *et seq.*, and its promulgated regulations. (Dkt. No. 1 at 2.)

Plaintiff alleges multiple errors by the ALJ, while Defendant requests the Court affirm the ALJ's decision. (*See* Dkt. Nos. 20, 22.) The Court has considered the briefing filed in

support of and in opposition to each party's position as well as the remainder of the evidentiary record. For the reasons that follow, the Court affirms the ALJ's ultimate disposition of Plaintiff's claims under the IDEA.

## I STATUTORY FRAMEWORK

### A. Overview of the IDEA

Congress enacted the IDEA to "ensure that all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment and independent living." 20 U.S.C. § 1400(d). The IDEA requires that students receive a free and appropriate public education ("FAPE") "through the development of an individualized education program." *McIntyre v. Eugene Sch. Dist. 4J*, 976 F.3d 902, 910 (9th Cir. 2020). The individualized education program ("IEP"), which is prepared at a meeting between a child's parent or guardians, the child's teacher, and a representative of the local educational agency, consists of a written document containing a summary of the child's educational performance, his or her goals, the educational services to be provided to the child, and the extent to which the child will be able to participate in the general education curriculum with nondisabled peers. *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 432 (9th Cir. 2010) (citing 20 U.S.C. § 1401(19)). Thus, "the IEP is the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 391 (2017) (citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 181 (1982)).

The IEP is the "centerpiece" of the IDEA's "education delivery system for disabled children." *Endrew F.*, 580 U.S. at 391 (citation omitted). An IEP prepared by the child's "IEP

team" must comply with a detailed set of procedures, *see* 20 U.S.C. § 1414(d)(1)(B), including a statement of the child's "present levels of academic achievement," a statement of "measurable annual goals," a statement of the child's progress toward meeting those goals, and a statement of the "program modifications or supports for school personnel that will be provided for the child." *Id.* § 1414(d)(1)(A)(i). A school district must comply with the IDEA "both procedurally and substantively" when formulating an IEP. *M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634, 644 (9th Cir. 2005) (citation omitted).

"Violations of the IDEA may arise in two situations." *J.W. ex rel. J.E.W.*, 626 F.3d at 432. A school district may violate the IDEA's procedural requirements, or a school district may be liable for a substantive violation "by drafting an IEP that is not reasonably calculated to enable the child to receive educational benefit." *Id.*; *see also Rowley*, 458 U.S. at 206–207; *N.B. v. Hellgate Elementary Sch. Dist., ex rel. Bd. of Directors, Missoula Cnty., Mont.*, 541 F.3d 1202, 1207 (9th Cir. 2008). However, not every procedural violation is sufficient to support a finding that a child was denied a FAPE; mere "technical deviations," for example, "will not render an IEP invalid." *Hellgate*, 541 F.3d at 1208 (citing *Amanda J. ex rel. Annette J. v. Clark County Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001)). On the other hand, procedural violations that result in the loss of educational access or opportunity, or that seriously infringe a parent's right to participate in the IEP process, result in the denial of a FAPE. *Id.* (citing *Amanda J.,* 267 F.3d at 892.) Thus, a harmless error standard of review is applied in evaluating procedural violations. *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 910 (9th Cir. 2009) ("[A] procedural violation may be harmless, and we must consider whether the procedural error either resulted in a loss of educational opportunity or significantly restricted parental participation.").

Parents have the right to request a "due process hearing" before an administrative hearing officer at the state or local education agency with respect to any matter relating to the identification, evaluation, or educational placement of their child, or the provision of a FAPE to their child. *See* 20 U.S.C. §§ 1415(f); 1415(b)(6); 1415(k)(3). "[A]t the conclusion of the administrative process [due process hearing], the losing party may seek redress in state or federal court." *Endrew F.*, 580 U.S. at 392. Courts act in equity when remedying IDEA violations. *Reid v. District of Columbia*, 401 F.3d 516, 523–524 (D.C. Cir. 2005). "'[T]he essence of equity jurisdiction" is 'to do equity and to [mold] each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it.'" *Id*. (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)). Thus, "relief [is] designed to ensure that the student is appropriately educated within the meaning of the IDEA," in a case-by-case manner. *Parents of Student W. v. Puyallup Sch. Dist., No. 3*, 31 F.3d 1489, 1497 (9th Cir. 1994). Additionally, "[s]tate [education] standards that are not inconsistent with federal standards under the IDEA are also enforceable in federal court." *Hellgate*, 541 F.3d at 1208.

**B. IEP Reevaluation Requirement**

Once a student is initially evaluated and an IEP is formed, a school district must "ensure that a reevaluation of each child with a disability is conducted" if it "determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation[.]" 20 U.S.C. § 1414(a)(2)(A)(i); 34 C.F.R § 300.303(a)(1). The school district may also reevaluate a student if the student's parents or teacher request a reevaluation. Id. § 1414(a)(2)(A)(ii). However, a school district "need not reevaluate a student in every area in which a parent requests reevaluation." *L.C. on behalf of A.S. v. Issaquah Sch. Dist.*, Case No. C17-1365JLR, 2019 WL 2023567, at *18 (W.D. Wash.

May 8, 2019), *aff'd sub nom. Crofts v. Issaquah Sch. Dist. No. 411*, 22 F.4th 1048 (9th Cir. 2022). "Rather, the district must review 'existing evaluation data' on the student and, on the basis of that review and input from the parents, 'identify what additional data, if any,' are needed to ensure the child receives a FAPE." *Id.* (quoting Wash. Admin. Code § 392-172A-03025(2)). This data includes (1) evaluations and information provided by the parents, (2) classroom observations, and (3) observations by teachers and other service providers. 34 C.F.R § 300.305(a)(1)(i)–(iii); *see also Baquerizo v. Garden Grove Unified Sch. Dist.*, 826 F.3d 1179, 1184 (9th Cir. 2016) (discussing the "assessment tools" used to create an IEP in both the initial evaluation and in subsequent reevaluation).

**C. IEE Requirements**

If parents disagree with an evaluation conducted by the school district, they can request an independent education evaluation ("IEE") at public expense. 34 C.F.R § 300.502(b)(1); *A.S. v. Shoreline Sch. Dist.*, Case No. C24-1360, 2025 WL 1770848, at *2 (W.D. Wash. June 26, 2025) (citing Wash. Admin. Code § 392-172A-05005(2)(a)). An IEE is "conducted by a qualified examiner who is not employed by the public agency responsible for the education of the child in question." 34 C.F.R. § 300.502(a)(3)(i). Upon receipt of such a request the school district can either provide the IEE or "[f]ile a due process complaint to request a hearing to show that its evaluation is appropriate." *Id.* § 300.502(b)(2); Wash. Admin. Code § 392-172A-05005(2)(c) (requiring the agency initiate a due process hearing within 15 days). If the school district chooses to initiate a due process hearing in response to an IEE request and the final decision is that the "[school district]'s evaluation is appropriate," the parent still has a right to an IEE, "but not at public expense." 34 C.F.R. § 300.502(b)(3).

**D. Private Placement Requirement**

"[W]hen a public school fails to provide a FAPE and a child's parents place the child in an appropriate private school without the school district's consent, a court may require the district to reimburse the parents for the cost of the private education." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 232 (2009).

## II FACTUAL BACKGROUND

### A. H.G.

H.G. is a 20-year-old woman. (AR 1885.) H.G. has been diagnosed with dyslexia and has had an IEP for basic reading since 2017, when she was in the fifth grade. (AR 1885, 2980.) She entered Franklin Pierce School District ("the District") in October 2019 as an eighth-grade student. (AR 1886.) An IEP reevaluation at the end of eighth grade concluded H.G. continued to have a specific learning disability in basic reading but transitioned her specially designed instruction ("SDI") from basic reading to reading fluency. (*Id.*) That evaluation also noted concerns with math and writing; while it did not impose SDI in either area, it recommended "a new evaluation should be considered" if issues persisted. (*Id.*)

H.G. began high school at Franklin Pierce High School in the fall of 2020. (*Id.*) H.G. "had an IEP for the entire time [she] attended Franklin Pierce High School." (AR 2974.) During her freshman year and the first half of her sophomore year, Plaintiff recalled H.G. struggling academically. (AR 1199.) However, other than receiving "no credit" for first semester biology, she passed all her courses during this time. (AR 2045.)

### B. Sophomore Year (2021-2022)

Because of "concerns with other academic areas and request for consideration of dyslexia noted within the evaluation," H.G.'s parents requested H.G. be re-evaluated during her tenth-grade year. (AR 1885.) A reevaluation was scheduled for February 1, 2022. (*Id.*) H.G. tested

in the ninth percentile in reading, ninth percentile in math, and forty-second percentile for written expression. (AR 1893.) Of the nine teachers to provide feedback on her course work, four teachers indicated, respectively, that while H.G. was "polite" and "kind," she "is quick to isolate or finds reasons to work on other things that the class is not working on," "likes to venture off to talk with friends," "struggle[s] to work independently," and "can sometimes be easily distracted by friends or get overwhelmed with too many assignments or directions." (AR 1891.) The district concluded H.G.'s "strongest academic area is written expression" while "reading skills, specifically reading fluency and decoding are an area of particular weakness." (AR 1886.) Her math skills were meeting standards. (AR 1887.) Accordingly, the District recommended "specially designed instruction . . . to continue in basic reading skills" but no specially designed instruction in math or writing and instead "support[ing] . . . math skills with accommodations or modifications . . . like use of a calculator, verbal assessment, and shortened or modified work." (AR 1887, 1893.) H.G. was not evaluated for executive functioning. An IEP was issued on February 8, 2022 and went into effect on February 11, 2022. (AR 1905–1906.)[1]

After the implementation of H.G.'s 2022 IEP plan, H.G. received passing grades during the second semester of her tenth-grade year. (AR 2045.) Her teachers do not recall her behavior indicating she needed additional support. (AR 61–62, 439, 645.) However, some testimony does indicate certain continued academic struggles. (AR 654, 1188.) She also did not pass either the English Language Arts or Math sections during state testing at the end of the year (AR 1920) and her English teacher expressed concern with her continuing into general education junior year English (AR 2258).

[1] H.G.'s parents also requested H.G. be placed into a GED program so she could pursue a career in the culinary arts, which the District denied. (AR 1197, 2070.)

**C. Junior Year (2022-2023)**

H.G.'s parents requested the District fund an IEE for H.G. at the beginning of her eleventh-grade year. The request was based in part on the fact H.G. had not had cognitive testing since April 2017. (AR 1914.) The request was also based on a belief that ADHD or other "executive functioning challenges" may be "impeding [H.G.'s] learning." (*Id.*) The school district approved the IEE request on August 23, 2022. (AR 1916.) Typically, an IEE takes "a couple of months to six months" to complete. (AR 64.) In this case, however, the IEE took nearly a full year to be completed.

H.G.'s IEP team met on February 1, 2023 before any IEE report was available. (AR 1918.) H.G. received all passing grades in the first semester of her eleventh-grade year, although her parents expressed concern that she did not know how to use the text-to-speech assistive device on her computer and had 19 or 20 missing assignments in Algebra II. (AR 1920, 2045.) Of the five teachers who gave feedback, all gave generally positive feedback, including that she is "doing well, she "has grown so much," "[h]er academic skills are some of the best in my class and she contributes to a positive classroom environment," and she "is doing a great job." (AR 1921.) Only one teacher—her Algebra II teacher—mentioned concerns about "struggl[ing] to stay on task and [being] distracted by her phone," but still "really enjoy[ed] having her in [the] class." (AR 1921.) Plaintiff ultimately failed the second semester of Algebra II although she passed the remainder of her classes. (AR 2045.)

**D. Dupuy's IEE**

H.G. met with Dr. Cindy Dupuy[2] in February and March 2023 to perform an "Executive Function evaluation, which needed to be completed before [H.G.] start[ed] her Full Evaluation." (AR 2082.) The document was labeled a "Psychoeducational Evaluation" but identified that its purpose was "to determine if there are factors such as executive functioning, attention, working memory, or oral language affecting learning." (AR 2083.) The Executive Function evaluation identified there were "indications that [H.G.] suffers from ADHD." (AR 2094.) The evaluation concluded that in H.G.'s case, "a drug trial might help clarify if she does suffer from ADHD." (*Id.*)

Dupuy's administrative assistant transmitted the Executive Function evaluation on May 2, 2023 to the District. (AR 2082.) The District appears to have scheduled a meeting for June 13, 2023 with Plaintiff to review Dupuy's evaluation. (AR 2105.) This meeting, however, was postponed at Plaintiff's request because H.G.'s full evaluation was not expected to be completed by that date. (*Id.*)

Dupuy finalized her evaluation report on July 21, 2023. (AR 1936.) This report also was titled as "Psychoeducational Evaluation." (*Id.*) The Executive Function evaluation was not included with the July 2023 evaluation report (AR 1067), nor is it referenced in the July 2023 evaluation report (*see* AR 1936–1981). Dupuy considers the two evaluations "as two separate documents" and Dupuy intended the Executive Function evaluation "to be used by a physician." (AR 1067.)

[2] Dupuy has a Ph.D. in Learning Disabilities and a Masters in Secondary Education. (AR 2988.) Dupuy has been in private practice since June 1998. (*Id.*)

The July 2023 evaluation identified H.G. "was previously diagnosed with ADHD and was reported to be taking stimulant medication throughout testing."[3] (AR 1936, 1956.) However, Dupuy opined that testing "results do not suggest that [H.G.] has a disorder characterized by attention deficits, such as ADHD." (AR 1939.) Despite her testing results, Dupuy testified she expected the District to include the Executive Function evaluation as part of its evaluation of H.G. (AR 1058.) Dupuy testified that "knowing [H.G.] had been diagnosed with ADHD, the District should have done an evaluation within the District to determine how the executive function deficits would be exhibited in the environment." (AR 1063.) But, Dupuy did not fault the District for not responding to the Executive Function evaluation at the time it was transmitted to the District in May 2023. (AR 1065.) In addition, Dupuy did not present the Executive Function evaluation to the District in September 2023. (AR 1068.) Dupuy also acknowledged that the Executive Function evaluation would no longer "accurately show how [H.G.] functioned once she was medicated." (AR 1075.) And Dupuy's testimony that the District should have performed an evaluation within the District is contradicted by the position she took in November 2023, as identified below.

**E. Senior Year (2023-2024)**

H.G. began her senior year at Franklin Pierce High School.[4] Dupuy met with officials from the District in September 2023 to discuss the IEE results. (AR 84.) Dupuy indicated she thought H.G. had "significant needs" and "needed to be in an outside placement" at the Gow

[3] The formal diagnosis appears to have occurred in June 2023 and H.G. began taking medication at that time. (*See generally* AR 2106–2108.)

[4] H.G.'s parents began communicating with the Gow Institute toward the end of September 2023. (AR 2117.)

School ("Gow") in New York. (AR 85.)[5] School officials recall feeling "a general sense of surprise at that recommendation" because "[b]ased on what teachers had observed and what [H.G.] was exhibiting in the school setting, that [] seemed like a pretty big jump from the student that [they] knew and experienced in school." (AR 85–86.)

H.G.'s parents also requested a reevaluation of H.G. based on Dupuy's newly recommended "services in writing and math." (AR 1983.) On November 21, 2023, the IEP team recommended H.G. receive "special education services as a student with a Specific Learning Disability" and recommended SDI "in the areas of basic reading, reading comprehension, written expression, and math calculation." (AR 2004.) The IEP team declined to change H.G.'s "qualifying category to Other Health Impairment due to her recent diagnosis of ADHD" because "[t]he category of Specific Learning Disability is more indicative of [H.G's] challenges in the school setting." (*Id.*) The IEP team also declined to add SDI in the area of executive functioning because "[t]eachers and [H.G.] reported that she is not struggling with these areas within the school setting at this time" and they believed her accommodations were sufficient to support her executive functioning skills. (*Id.*)

H.G.'s parents adopted a dissenting opinion written by Dupuy. (AR 2008–2020.) As part of her opinion, Dupuy identified that H.G. "should not complete any additional individually administered testing, [but] did request the use of rating scales." (AR 2008, 1075.) These rating scales would be in addition to the ones H.G.'s teachers performed before H.G. began ADHD medication, and even though the teachers "reported very little concern in the area of ADHD" when they performed the premedication rating scales. (AR 1077.)

---

[5] Gow is based in New York and uses a "reconstructive language" approach to reading. (AR 904.) Students from the area can attend the school as day students and non-local students live on campus.

On December 14, 2023, H.G.'s team held an IEP meeting. A draft IEP was created with annual goals for math (AR 2028–2029), reading (AR 2029–2030), and writing (AR 2030–2031). H.G.'s parents rejected the December 2023 IEP. (AR 103.) The IEP was finalized on January 26, 2024. (AR 481.)

On January 22, 2024, H.G.'s parents submitted a letter to the District informing the District of their intent to unilaterally place H.G. at Gow and seek reimbursement. (AR 2021.) H.G.'s last day in the District was February 6. (AR 1329.) H.G. began at Gow later that month as a junior. (AR 983.)

## III PROCEDURAL BACKGROUND

H.G.'s parents filed a due process hearing request on April 5, 2024. (Dkt. No. 1 at 13.) An ALJ held six days of hearings over September and October (*id*. at 13) and issued a final order on January 31, 2025. (AR 1876.) Plaintiff filed a complaint before this Court on May 1, 2025. (Dkt. No. 1.) The matter is fully briefed. (*See* Dkt. Nos. 20, 22, 24, 25.)

## IV STANDARD OF REVIEW

"[J]udicial review in IDEA cases differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review." *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir.1993).

> Under 20 U.S.C. § 1415(i)(2)(C), the district court reviews the records of the state due process hearing, hears additional evidence offered by the parties, and then 'basing its decision on the preponderance of the evidence, . . . grant[s] such relief as the court determines appropriate.' Thus, the statute commands the district court to review the evidence and come to its own conclusion about what relief is appropriate.

*Ashland Sch. Dist. v. Parents of Student E.H.*, 587 F.3d 1175, 1182 (9th Cir. 2009).

It is implied that due weight shall be given to the due process proceedings. *Capistrano Unified Sch. Dist. v. Wartenberg*, 59F.3d 884, 891 (9th Cir. 1995). This means a court "'must give deference to the state hearing officer's findings, particularly when . . . they are thorough and careful' . . . and 'avoid substitut[ing] [its] own notions of sound educational policy for those of the school authorities which [it] reviews.'" *Parents of Student E.H.*, 587 F.3d at 1182 (first quoting *Seattle Sch. Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1499 (9th Cir. 1996); then quoting *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994)). "The amount of deference accorded the hearing officer's findings increases where they are 'thorough and careful.'" *Wartenberg*, 59 F.3d at 891 (quoting *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994)). This occurs "when the officer participates in the questioning of witnesses and writes a decision 'containing a complete factual background as well as a discrete analysis supporting the ultimate conclusions.'" *R.B., ex rel. F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 942 (9th Cir. 2007) (quoting *Park, ex rel. Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1031 (9th Cir. 2006)). "Mixed questions of fact and law are reviewed de novo unless . . . the question is primarily factual." *Id*. at 937.

In the end, the district court must consider the findings "carefully and endeavor to respond to the hearing officer's resolution of each material issue," but the court "is free to accept or reject the findings in part or in whole." *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987) (quoting *Town of Burlington v. Dep't of Educ. for the Commonwealth of Mass.*, 736 F.2d 773, 792 (1st Cir. 1984), *aff'd*, 471 U.S. 359 (1985)).

In addition, unchallenged findings and conclusions become verities on appeal. *See Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1164 (9th Cir. 2003) (courts "ordinarily will not consider matters on appeal that are not specifically and distinctly argued in

an appellants' opening brief"); *Kim v. Kang*, 154 F.3d 996, 1000 (9th Cir. 1998) (declining to consider argument of an appellee where "[i]t does not designate itself a cross-appellant, and there is no indication that it has complied with any appellate procedural requirements, such as filing a timely notice of appeal").

"The burden of proof in the district court rest[s] with . . . the party challenging the administrative decision." *Hood v. Encinitas Union Sch. Dist*., 486 F.3d 1099, 1103 (9th Cir. 2007). In this case, that is Plaintiff.

## V DISCUSSION

### A. Deference to ALJ's findings and conclusion

Plaintiff argues no deference should be given "to most of the ALJ's findings and conclusions as they are neither careful nor thorough." (Dkt. No. 20 at 15.)

1. Alleged burden shifting

Plaintiff first asserts the ALJ "repeatedly" shifted the District's burden to H.G. during the proceedings. (*Id.*) As support, Plaintiff claims the ALJ mischaracterized evidence that "improperly shifted" the District's "burden and disregarded unrebutted evidence." (*Id*. at 16.)

It is unclear what Plaintiff means when she argues that the ALJ was mischaracterizing and how it relates to improper burden shifting. For example, Plaintiff asserts the "ALJ erred by mischaracterizing H.G.'s February 2023 IEP to conclude she was 'meeting classroom standards' that called for basic reading skills in courses." (*Id*. at 15.) Plaintiff does not identify what information in the February 2023 IEP the ALJ allegedly mischaracterized. Instead, Plaintiff argues the ALJ's finding that H.G. was meeting classroom standards is not supported by the record (*id.*)—which is a legal argument, not an argument about factual mischaracterization.

Plaintiff also argues "the ALJ relied on the absence of a reference to H.G.'s ADHD in IEP progress notes to conclude her teachers were unaware of it" (*id.* at 16), but does not identify how the ALJ mischaracterized evidence in making this finding. Plaintiff offers only a vague statement that the "ALJ cites no evidence supporting her expectation" that "IEP progress monitoring is to track goals, not document diagnoses." (*Id.*)

Plaintiff further asserts the ALJ "found Dr. Dupuy's 'IEE referenced teacher reports and classroom observations, but did not include any.'" (*Id.*) Plaintiff asserts this finding does not mean such reports and observations do not exist (*id.*), but again, Plaintiff does not identify how this finding is a mischaracterization of the evidence that indicates improper burden shifting.

In summary, the Court finds no basis to conclude the ALJ improperly shifted the burden during the proceedings.

2. Alleged mischaracterization of evidence Plaintiff asserts "likely caus[ed] erroneous conclusions"

*i. Provision of SDI*

Plaintiff argues that the ALJ mischaracterized the evidence by (1) concluding the practice of pairing H.G. with another student who struggled with reading was SDI and (2) by focusing on David Conant's testimony[6] that H.G. did not struggle with organizing and planning, while ignoring staff reports that H.G. struggled with motivation. (Dkt. No. 20 at 16.)

The ALJ, however, did not conclude that Plaintiff's reading with another student was SDI. Rather, the ALJ noted, "[t]o *support* the Student's SDI in Sophomore English, Mr. Conant matched the Student with a reading partner to read to each other." (AR 1790) (emphasis added).

[6] Conant is a special education teacher at Franklin Pierce High School and co-chair of the department. (AR 423–24.)

Furthermore, the ALJ's Order did not omit teacher reports of struggles with motivation. Rather, the Order states, "the progress report noted, '[s]ometimes motivation is a struggle, but she seems highly capable of completing the work at a high rigor when she decides to do so.'" (AR 1791.)

The Court finds no mischaracterization of the evidence regarding the provision of SDI.

*ii. Expertise of witnesses*

Plaintiff points out the ALJ incorrectly found Dupuy is not certified as a general education or special education teacher and that Dupuy's opinions were accorded limited weight, "at least in part," because of this error. (Dkt. No. 20 at 17.) But Plaintiff does not engage all of the other reasons, as the District points out, why Dupuy's opinions ultimately carried limited weight. The ALJ noted Dupuy lacked experience in delivering SDI to special education students, that she had never administered the UFLI curriculum, and no longer taught decoding. (AR 1842, 1047, 1089.) Therefore, ALJ's finding that Dupuy was not certified as a general or special education teacher does not by itself indicate the ALJ erred in provided limited weight to Dupuy's opinions.

Plaintiff also asserts "[n]one of the statements of fact assigned to Dr. Bube at [Finding of Fact] 211 are factual." (Dkt. No. 20 at 17.) But reviewing all the findings together makes clear that Finding of Fact 211 contains a scrivenor's error. It misidentifies Bube as the District's literacy specialist rather than Suzanne Paul. One need only compare Finding of Fact 211 with Findings of Fact 121 through 126, which discuss Paul's qualifications, her familiarity with UFLI, and her review of UFLI on the District's behalf. (*See* AR 1815–1817.)

Plaintiff further notes the ALJ "erroneously concluded Dr. Bube assists with transition planning at" the District and that the ALJ "relied on the faulty premise that Dr. Bube knew

significantly more about the innerworkings of [the District] than the record supports." (Dkt. No. 20 at 18, citing to FF 181–183.) This argument is based on the ALJ's finding that Bube is the District's Director of Special Services rather than acknowledging Bube as the Director of Special Services for the Mercer Island School District. (*Compare* AR 1833, FF 181 with AR 2181.) This error is harmless, however, because the ALJ recognized Bube was offered as an expert witness and not as a fact witness who worked with H.G. on the District's behalf. (*See* AR 1833–1836.) Plaintiff also does not challenge Bube's professional qualifications, which the ALJ relied on in making findings. And those professional qualifications are unaffected by whether Bube was employed by the District or the Mercer Island School District.

Plaintiff next argues the ALJ's reference to Ducheneaux as "Dr. Ducheneaux" indicates the ALJ improperly deferred to Ducheneaux's testimony over Dupuy's "professional concerns" on the "mistaken belief Ducheneaux was a Ph.D." (Dkt. No. 20 at 18.) But it does appear the ALJ accurately summarized Ducheneaux's qualifications (AR 1801 n.174) and Plaintiff offers no challenges indicating the ALJ mischaracterized Ducheneaux's testimony.

The Court finds the misstatements identified above amount to harmless error.

*iii. Thompson's and Marshman's testimony*

Plaintiff asserts the ALJ engaged in a "tortured interpretation of the evidence" by (1) finding that Brian Thompson[7] acknowledged H.G. "could make progress without the structured literacy program" Gow offers and (2) that Thompson and Robin Marshman[8] "agreed that [H.G.] does not require a residential placement to make academic progress but stated that [H.G.] does require specialized instruction in the area of reading." (Dkt. No. 20 at 18–19, quoting AR 1830,

---

[7] Thompson is the Chair of the Reconstructive Language Department at Gow. (AR 904.)

[8] Marshman is the Head of the Upper School at Gow. (AR 999.)

FF 172.) Thompson, however, did testify that he believed "in the efficacy of reconstructive language" program offered by Gow, but that H.G. "could make progress without it." (AR 944.) He also testified he did not believe a student necessarily needed "to live at Gow to make academic progress." (AR 943.) Marshman echoed Thompson's opinions, stating, "I don't think [H.G.] requires a residential placement" and also acknowledged there "are several reading programs out there that try" to address reading deficits. (AR 995.)

The ALJ's finding was not a tortured interpretation of Thompson's and Marshman's testimony.

3. Alleged material omissions

Plaintiff's final factual argument is her identification of a litany of statements that she argues show "[t]he ALJ's decision evinces a complete lack of careful, impartial consideration of all of the evidence and makes several material omissions." (Dkt. No. 20 at 19.) Plaintiff subdivides her issues with the ALJ's order into nine categories; several of these categories involve multiple alleged factual errors.

*i. 2022 Reevaluation and subsequent IEPs*

Plaintiff argues the ALJ omitted from Finding of Fact 8 that the February 2022 IEP identified H.G. can "get overwhelmed with too many assignments or directions." (Dkt. No. 20 at 19, quoting AR 1891.) The Court acknowledges this statement was omitted, but such omission does not mean the ALJ erred in finding, based on the teacher's reporting, that H.G. was "performing as well as her other classmates." (*See* AR 1891.)

Plaintiff also asserts Finding of Fact 9 failed to address Bryan Zagar's testimony[9] that H.G. had struggles earlier in the school year while finding that Zagar reported no concerns with

[9] Zagar is a Social Studies teacher at Franklin Pierce High School. (AR 638.)

H.G.'s progress in class. (*Id.*) Plaintiff also asserts the ALJ "put a positive spin on Zagar's testimony, finding H.G. was on the cusp of failing Zagar's class" but then identifying H.G. "ultimately earned a passing grade." (Dkt. No. 20 at 19–20.) Zagar testified H.G. did exhibit progress, "I do remember, over the course of the year, the Student starting to develop more of that kind of intrinsic motivation of doing work and doing learning on her own[.]" (AR 641–642.) He further testified he believed H.G. made academic progress. (AR 645.) And the record identifies H.G. was receiving a C+ grade in Zagar's class. (AR 1891.) Notwithstanding Plaintiff's characterization of the evidence, the Court finds no reason to conclude H.G. was "given a passing grade" as opposed to H.G. "earn[ing] a passing grade." (*see* Dkt. No. 20 at 20.) The Court does not find Finding of Fact Number 9 was unsupported by the record.

Plaintiff also takes issue with Finding of Fact 12 wherein the ALJ found teacher reports "did not indicate . . . the Student experienced any specific social/emotional/study skills or executive functioning difficulties." (Dkt. No. 20 at 20, citing AR 1787.) Plaintiff identifies specific teacher comments that could be used to challenge the accuracy of this finding. (*Id.*) But even so, the Court cannot conclude Finding of Fact 12 is an inaccurate summary of the teachers' comments reported in the 2022 Reevaluation when considering all the positive comments the teachers offered. (*See* AR 1891–1892.)

Plaintiff asserts Finding of Fact 14 incorrectly identified H.G.'s "testing in math reflected she was performing in the average range." (Dkt. No. 20 at 21, citing AR 1893.) The 2022 Reevaluation did state, "When looking at her testing data in math, she is actually performing in the Average range with math problem solving skills." (AR 1893.) The Court cannot conclude Finding of Fact 14 is materially inaccurate based on the record presented.

Finally, Plaintiff argues the ALJ failed to address the reason H.G. was interested in culinary arts was because of her low reading skills, which Plaintiff and H.G. shared with the District during the 2022 IEP meeting. (Dkt. No. 20 at 21.) But the ALJ did acknowledge, "Parent believed that a career path in culinary arts might be appropriate for the Student, as it did not require a lot of reading." (AR 1788.) The Court does not conclude the ALJ failed to consider Plaintiff and H.G.'s comments related to the reasons for H.G.'s interest in culinary arts.

ii. *H.G.'s spring 2022 passing grades*

Plaintiff next challenges the ALJ's statement that, "H.G. passed her classes in Spring 2022." (Dkt. No. 20 at 21.) Plaintiff argues the ALJ ignored testimony that "H.G. was on the cusp of failing Geometry, Physical Science, and World History" and "did not receive any reading that was reasonably calculated to provide educational benefit during this time." (*Id.*) According to Plaintiff, "the ALJ erroneously took H.G.'s passing marks at face value without addressing competing and uncontroverted evidence of H.G.'s significant struggles and a lack of appropriate instruction to support her academic progress." (*Id.*)

Plaintiff testified H.G. was in jeopardy of failing certain classes related to missing assignments. (AR 1188–1189.) But it is unreasonable to conclude H.G. did not earn passing grades merely because H.G. struggled with missing assignments. There is no indication H.G. failed to complete sufficient classwork such that the grades recorded do not reflect the work Plaintiff performed.

iii. *Price's testimony*

Plaintiff challenges Finding of Fact 62 wherein the ALJ accepted Matthew Price's testimony[10] that H.G. "read the primary class text," in his Food Justice Course, and that H.G.

[10] Price taught Food Justice during the 2022–23 school year. (AR 174–175.)

"independently read the text with audio approximately 50% of the time, read out loud or in small groups about 25% of the time, and independently read the text approximately 25% of the time." (AR 1799; Dkt. No. 20 at 22.) Plaintiff argues H.G.'s testimony indicates "that with one exception, she never independently read in Price's class" and that the ALJ failed to address why Price's testimony was deemed more credible. (Dkt. No. 20 at 22.) Plaintiff also argues the ALJ ignored that H.G. was engaging only in listening comprehension and not reading comprehension. (*Id.*) According to Plaintiff, the ALJ's erroneously concluded that the District provided appropriate reading instruction and SDI. (*Id.*)

First, the ALJ in drafting the findings identified that to "the extent a Finding of Fact adopts one version of a matter on which the evidence is in conflict, the evidence adopted has been determined more credible than conflicting evidence." (AR 1783.) Second, H.G.'s and Price's testimony are not directly in conflict. H.G. states "the only books I remember reading were children's books" (AR 2975), but she does not state she disagrees with Price's testimony. H.G. did not state she never independently read class text or that she never read aloud or in small groups in Price's class.

Accordingly, the Court cannot conclude the ALJ erred when considering Price's and H.G.'s testimony.

*iv. Additional supports*

Plaintiff next objects that the ALJ adopted a statement in the November 2023 Prior Written Notice ("PWN"). (Dkt. No. 20 at 22.) The PWN identifies "teachers and [H.G.] reported that she is not struggling" in "the areas of organization and planning." (AR 2004.) Plaintiff argues the ALJ's adoption of this statement failed to consider Kyle Fagan's report[11] that

[11] Fagan is the Bridge to College English instructor. (AR 2027.)

H.G. "will shut down if tasks become too difficult. She struggles to read and comprehend at grade level and struggles to stay on task when the topic of study is not interesting to her." (AR 2027; Dkt. No. 20 at 22–23.) However, Dupuy concluded that H.G.'s testing results "do not suggest that [H.G.] had a disorder characterized by attention deficits, such as ADHD" (AR 1939) and Fagan testified he believed H.G. did not have deficits in executive functioning. (AR 1425.)

The Court finds no basis to conclude the ALJ inappropriately relied on information contained in the PWN.

*v. Paul's testimony on UFLI implementation*

Plaintiff asserts the ALJ's finding that a "teacher without any experience in providing literacy instruction could implement the UFLI program with appropriate support, such as coaching, modeling and providing feedback" conflicts with Paul's testimony that "she would need to provide 'daily' coaching to start." (Dkt. No. 20 at 23.) But the District points out the teacher implementing UFLI (Conant) has experience in literacy instruction. (AR 426, 456, 460, 511–512.) And Paul explained that coaching for a teacher *without* any experience in providing reading literacy instruction "would be in the beginning, probably daily, and then backing off as comfort and confidence come into play for the teacher." (AR 241–242.) It, therefore, is logical to conclude that a teacher *with* literacy instruction experience would not need daily coaching. The Court finds no conflict between Paul's testimony and the ALJ's finding.

Plaintiff also asserts Dupuy and Thompson "agreed . . . at least three to five years of experience" was necessary for "effective foundational reading instruction." (Dkt. No. 20 at 23–24.) As support for this statement, Plaintiff cites to five pages from Thompson's testimony (AR 914–919), but Thompson was not offering any opinions about UFLI. And for reasons identified

previously, *see supra* Section V.A.2.ii, the ALJ identifies the reasons why she found Paul's opinions about UFLI implementation more persuasive than Dupuy's.

*vi. Readiness for vet tech program*

Plaintiff objects to the ALJ's reliance on Bube's opinion that H.G. had the skills to complete classes at a community college, which contradicted Dupuy's opinion. (Dkt. No. 20 at 24.) Plaintiff points out that by February 2024, H.G. was failing her vet tech program course. (*Id.*) However, the ALJ identified Bube noted H.G. had received a B- in her vet tech class, which supported Bube's opinion. (AR 1836.) The District also points out that the second semester started January 29, 2024 and that the District was only six days into the semester when H.G. unenrolled.[12] (Dkt. No. 22 at 14, n.6, citing to AR 467, 2214.)

The Court does not find the ALJ committed reversible error as Plaintiff argues.

*vii. Parent engagement at the December 2023 IEP meeting*

Plaintiff asserts Finding of Fact 133 fails to identify that Plaintiff and her legal counsel provided feedback at the December 2023 IEP meeting. (Dkt. No. 20 at 24.) But Plaintiff testified at the IEP meeting "the family reserved on providing input about Student's strength" and that her husband stated he "didn't want to speak without consulting with legal." (AR 1325.) The Court finds no deficiency with Finding of Fact 133.

*viii. Conant's testimony on progress monitoring and provision of SDI*

Plaintiff acknowledges Findings of Fact 136 and 143 "are a fairly accurate summation of part of Conant's testimony." (Dkt. No. 20 at 24.) At the same time, Plaintiff asserts Conant provided conflicting testimony that calls into question the ALJ's conclusion that H.G.'s IEP

[12] It also is unclear what impact the timing of the decision to place H.G. at Gow had on H.G.'s engagement in the vet tech class.

goals were appropriate. (*Id*. at 24–25.) In Plaintiff's opinion, the ALJ's failure to address Conant's alleged conflicting testimony shows a lack of "carefulness, impartiality and sensitivity" on the ALJ's part. (*Id*. at 25.) The Court is unclear how Plaintiff draws this conclusion from the testimony cited.[13]

Plaintiff also asserts the ALJ wrongly concluded the District provided H.G. SDI in January and February 2024. (*Id*. at 25.) Plaintiff argues the ALJ improperly relied on the Huff's description[14] of her interactions with H.G. during that time period rather than focusing on H.G.'s description of the absence of instruction on "how to learn . . . words." (*Id*.) However, it was not unreasonable for the ALJ to credit the educators' testimony as to their understanding of the educational services they were providing rather than H.G.'s perception of the educational services she was receiving during that time period.

*ix. Brieger's testimony*

Plaintiff argues the ALJ did not carefully and impartially review Dr. David Brieger's testimony[15] about Dupuy's IEE report. She argues the ALJ (1) incorrectly stated Dupuy was not certified while ignoring that Brieger was not certified (Dkt. No. 20 at 25–26), (2) weighed Brieger's review of the record heavily without acknowledging Dupuy also reviewed the record extensively (*id*. at 26), (3) failed to consider Dupuy's experience performing evaluations and

---

[13] Conant identified that he could not explain why there was such a large gap between the reported base level fluency (79 WCPM with 85% accuracy) and the goal identified (150 WCPM with 95% accuracy) in the 2023 IEP. (AR 505, 2029.) Conant concluded it "probably was a cut-and-paste from her previous IEP into that, and I changed the goal, but probably failed to change the initial data point." (AR 503.) This alone does not establish the ALJ lacked a basis to conclude the IEP goals were appropriate.

[14] Huff is a special education paraeducator, but the Court was not able to identify Huff's first name. (AR 1820.)

[15] Brieger is a Clinical Professor at the University of Washington, Department of Psychiatry and Behavioral Sciences. (AR 2175.)

ignored that there is no evidence Brieger has ever conducted such an evaluation (*id.*), (4) incorrectly stated Brieger educates future teachers on how to conduct evaluations when he in fact educated students training to be psychologists (*id.*), and (5) ignored that Brieger had previously been found to have mislabeled and failed to upload reports (*id.*). Plaintiff argues these omissions show different standards being applied to Dupuy and Brieger and constitute reversible error. (*Id.*) The District responds that one need not be a teacher to evaluate an evaluation and the other misstatements or omissions alleged are immaterial. (Dkt. No. 22 at 25.)

The Court finds these alleged omissions immaterial. The ALJ identified Brieger "was called to testify as an expert witness on behalf of the District regarding the validity of Dr. Dupuy's July 2023 IEE." (AR 1836, FF 192.) Brieger has extensive experience in evaluating how testing is performed, including authoring a book published by the American Psychological Association "that focused on performing evaluations, including IEEs, and how to identify testing performance validity." (AR 1837, FF 193.) Brieger offered opinions about the testing methodologies Dupuy used in preparing her IEE. Though related, the purpose of Brieger's testimony was in fact different than the purpose of Dupuy's testimony. Accordingly, the ALJ's alleged differential treatment of Brieger's qualifications and testimony as compared to Dupuy's does not indicate the ALJ improperly relied on Brieger's opinions.

*x. Summary*

Although Plaintiff disagrees with the ALJ's analysis of the record and the various findings and conclusions, the Court cannot conclude the ALJ was neither careful nor thorough in her review of the record such that the ALJ's findings and conclusions should not be afforded deference.

**B. District's November 2023 Reevaluation of H.G.**

Plaintiff argues the District's November 2023 reevaluation "was not sufficiently comprehensive and failed to assess H.G. in all areas of suspected disability by excluding the area of social, emotional, or behavioral, despite testing suggesting challenges related to ADHD may interfere with H.G. education and I.D.'s repeated concerns." (Dkt. No. 20 at 28.) Plaintiff also argues the reevaluation was inappropriate because "it did not consider Dr. Dupuy's executive function assessment and report during the 2023 Reevaluation." (*Id.*)

Dupuy, Plaintiff's own expert, contradicts Plaintiff's position. Dupuy opined that H.G. "should not complete any additional individually administered testing." (AR 2008.) And as the District points out, Plaintiff "offers no explanation as to what additional executive functioning testing the District purportedly should have conducted" considering Dupuy's position. (Dkt. No. 25 at 9.) Also absent from the record is any opinion identifying the specific type of assessment that Plaintiff now argues should have been performed in the "area of social, emotional, or behavioral."

Plaintiff further asserts that, based on *Timothy O. v. Paso Robles Unif. Sch. Dist.*, 822 F.3d 1105 (9th Cir. 2016), the District had a duty to conduct a comprehensive reevaluation and a duty to "assess H.G. in all areas of suspected disability" because the District had knowledge of H.G.'s ADHD diagnosis. (Dkt. No. 20 at 27.) *Timothy O.* identifies that the "IDEA requires that when a school district is afforded reason to suspect that a child has a disability, it [must] 'conduct a full and individual initial evaluation' that ensures the child is assessed for 'all areas of suspected disability,' using a variety of reliable and technically sound instruments." 822 F.3d at 1109 (quoting 20 U.S.C. §§1414(a)(1), (b)(2)–(3)). The school district in *Timothy O.* failed to comply with its obligations because the school district:

> was aware [the student] displayed signs of autistic behavior, and therefore, autism was a suspected disability for which it was required to assess him. It chose, however, not to

> formally assess him for autism because a member of its staff opined, after an informal unscientific observation of the child, that [the student] merely had an expressive language delay, not a disorder on the autism spectrum.

*Id*.

Here, unlike *Timothy O*., the District's decision not to perform any additional assessments despite knowledge of H.G.'s ADHD diagnosis was based on Dupuy's recommendation that H.G. should not undergo additional individually administered testing (AR 1847, CL 23) and Dupuy's opinion that the testing Dupuy performed did not suggest H.G. had a disorder characterized by ADHD (AR 1847, CL 25). The District did not simply rely on the "informal unscientific observations of" its staff during the November 2023 reevaluation. As the ALJ concluded, the District relied on Dupuy's opinions and the existing data in its possession, which included the February 2022 evaluation, H.G's IEPs, school assessments and grades, and medical records. (AR 1847, CL 23, 26.)

The Court does not conclude the ALJ erred in concluding the November 2023 reevaluation was appropriate.

**C. June 2022 to January 2024 FAPE**

1. Math – June 2022 to January 2024 FAPE

Plaintiff argues H.G. was not provided a FAPE from June 2022 to January 2024 because the District did not provide her with SDI in the area of math nor address her executive functioning needs. (Dkt. No. 20 at 30.) With regard to math, Plaintiff identifies H.G. scored in the fifth percentile in math computation and that she did not meet high school expectations for math. (*Id*. at 31.) Plaintiff further identifies H.G. failed Algebra II during the second semester of the 2022–23 school year. (*Id*. at 32.) This information, combined with H.G. ultimately being

found eligible for SDI in Math in 2023, indicates SDI in math should have been provided before November 2023, Plaintiff argues. (*Id.*)

The February 2022 reevaluation concluded H.G. was not eligible for math services and there is nothing in the record indicating Plaintiff timely challenged that decision.[16] (*See* AR 1894.) At that time, the District identified H.G. was "performing in the Average range with math problem solving skills" and that the "work she was producing in math class is meeting standard." (AR 1893.) Because of these findings, the District determined SDI in math was not necessary at that time. Plaintiff now disagrees with that decision. And although H.G. failed Algebra II during the second semester of the 2022–23 school year, Plaintiff fails to identify authority requiring the District to provide SDI before November 2023. Accordingly, the Court finds no basis to conclude the ALJ erred.

2. Executive Functioning – June 2022 to January 2024 FAPE

Plaintiff argues that after the District implemented the February 2022 IEP, "H.G. continued to struggle in [executive functioning] during the 2022–23 and part of the 2023–24 school years." (Dkt. No. 20 at 32.) For support, she cites to teacher comments identifying H.G.'s struggles in various classes during the 2022–23 and 2023–24 school years, H.G.'s failing grade in Algebra II the second semester of the 2022–23 school year, and that H.G. was receiving a failing grade in her Vet-Tech course in February 2024. (*Id.*) Considering these examples together with the difficulties that supported the February 2022 IEP, Plaintiff argues the District failed to provide a FAPE because "it failed to evaluate and support [H.G.'s] executive functioning needs." (*Id.*)

---

[16] As identified by the ALJ, the two-year statute of limitations applies to the development of the February 2022 IEP. (AR 1849–50) (citing Wash. Admin. Code § 392-172A-05080(2)). The February 2022 IEP is not at issue in this matter.

The record identifies that H.G. passed all but one class between the end of June 2022 and June 2023. (AR 2045.) Plaintiff also only cites to two teacher comments: (1) one teacher (Hemicker, Geometry 2022–23) indicating H.G. is doing "okay" in class but identifying she sometimes does not stay on task and is distracted by her phone, and (2) the other (Fagan, English 2023–24) identifying that H.G. "will shut down" if work is too difficult and that H.G. finds it difficult to remain focused when she find a topic uninteresting. (Dkt. No. 20 at 32.) The Court is unable to conclude these two teacher comments from different school years and one failing grade in Math during the second semester of the 2022–23 school year establish the ALJ erred in concluding the District did not fail to adequately evaluate H.G. in the area of executive function. (*See* AR 1850–53.)

Moreover, even if the District should have been on notice to further evaluate executive function at some point between June 2022 and when it learned of H.G.'s ADHD diagnosis in 2023, any delay was reasonable because the District was waiting Dupuy's IEE results. While "a *failure* to assess a child for a suspected disability does constitute [a procedural violation of the IDEA]," "some delay in complying with IDEA's procedural requirements is permissible." *D.O. By and Through Walker v. Escondido Union Sch. Dist.*, 59 F.4th 394, 411 (9th Cir. 2023) (finding a four-month delay in reassessing a student for autism reasonable where part of a district's delay "was because it 'was waiting to see [an expert's] report before presenting [the parent] with an assessment plan so [the district] would not improperly assess [the student] by reusing the same instruments."). Here, Dupuy began the process of an IEE evaluation and, while the IEE took longer than typical, it was not unreasonable for the District to wait for the IEE results before further evaluating H.G.'s needs.

3. January 2024 FAPE (Reading)

*i. Use of UFLI*

Plaintiff asserts UFLI was not reasonably calculated to deliver educational benefit to H.G. (Dkt. No. 20 at 33.) She relies on Dupuy's criticism of UFLI; in particular the absence of nonsense words aimed at improving decoding skill in UFLI's curriculum. (*Id.*) According to Plaintiff, she has overcome the presumption of discretion afforded to educators selecting methodologies for instruction because "Dupuy was the only person among the IEP team qualified to assess literacy instruction, and she opined UFLI was not appropriate." (*Id.* at 34.)

However, as previously identified, *see supra* Section V.A.2.ii., Plaintiff does not engage all of the reasons why Dupuy's opinions ultimately carried limited weight as compared to the District's witnesses. The ALJ noted Dupuy lacked experience in delivering SDI to special education students, that she had not administered the UFLI curriculum, and that Dupuy no longer taught decoding. (AR 1842, 1047, 1089.) The record supports the ALJ's decision to afford limited weight to Dupuy's opinions and the Court does not find the ALJ erred in relying on the District's witnesses to conclude the District's use of UFLI was reasonably calculated to deliver educational benefit to H.G.

*ii. District's UFLI implementation plan*

Plaintiff faults the District's implementation of UFLI asserting that "the IEP team included minutes with Paul for every other week, which was deficient by orders of several magnitude based on Paul's testimony." (Dkt. No. 20 at 35.) But again, the teacher implementing UFLI (Conant) had experience in literacy instruction. (AR 426, 456, 460, 511–512.) And Paul explained that coaching for teacher *without* any experience in providing reading literacy instruction "would be in the beginning, probably daily, and then backing off as comfort and confidence come into play for the teacher." (AR 241–242.) Because Conant had experience

in literacy instruction, the Court is unable to conclude it was inappropriate for the IEP team to include consultation minutes with Paul for every other week.

Lastly, Plaintiff argues that "as detailed throughout [her opening brief] . . ., Conant and Huff did not have the requisite experience to implement UFLI." (Dkt. No. 20 at 35.) But as the ALJ concluded, it was the "use of the UFLI literacy curriculum with [H.G.], along with collaborative support and planning from the District literacy specialist" that formed the basis for concluding both UFLI and its implementation were appropriate. (AR 1861, CL 97.) The ALJ did not err in concluding the January 2024 IEP was reasonably calculated to deliver educational benefit.

**D. Placement at Gow**

"Parents who place their children in private schools pending review proceedings under the IDEA are entitled to reimbursement if (1) the public placement violated the IDEA and (2) 'private school placement was proper under the Act.'" *Doug C. v. Hawaii Dept. of Educ.*, 720 F.3d 1038, 1047–1048 (9th Cir. 2013) (quoting *Florence Cnty. Sch. Dist. Four v. Carter By and Through Carter*, 510 U.S. 7, 15 (1993)).

The Court has not found the District's public placement violated the IDEA. Accordingly, there is no basis to award reimbursement to Plaintiff for H.G.'s private placement.

**VI ORDER**

For the reasons identified herein, the Court rules in favor of the District and otherwise affirms the ALJ's ultimate disposition of Plaintiff's IDEA claims.

Dated this 30th day of September 2026.

David G. Estudillo
United States District Judge